Alice **CRUSE**, Plaintiff–Appellant,

v.

**UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES,** Defendant–Appellee.

No. 94–6230.

United States Court of Appeals, Tenth Circuit.

Feb. 23, 1995.

---

James R. Linehan, Midwest City, OK, for plaintiff-appellant.

Vicki Miles–LaGrange, U.S. Atty., Gayla Fuller, Chief Counsel, and Rodney A. Johnson, Asst. Regional Counsel, Office of the Gen. Counsel, U.S. Dept. of Health & Human Services, Dallas, TX, for defendant-appellee.

Before MOORE, BARRETT, and EBEL, Circuit Judges.

BARRETT, Senior Circuit Judge.

Alice Cruse appeals from the district court's order affirming the denial of her application for social security disability benefits by the Secretary of Health and Human Services. The Secretary determined that despite Ms. Cruse's physical and mental impairments, she could perform certain light-work, low-stress jobs and therefore was not disabled. Ms. Cruse contends that the Sec-

retary failed to properly consider her mental impairments. We agree and reverse.[1]

Ms. Cruse applied for disability benefits as of October 1989, at which time she was thirty-two years old. She had previously been employed as a spot welder and assembly line worker. She claimed she was disabled as a result of carpal tunnel syndrome, back problems, and mental problems. At the time of her hearing before the administrative law judge (ALJ), she had had six surgeries on her wrists and arms related to carpal tunnel syndrome, and more were scheduled. She also had chronic back syndrome and three bulging disks in her lower back that were being treated conservatively. She complained of pain in her back, hands, wrists, legs, knees, and feet.

Though Ms. Cruse's physical impairments are severe, our focus is on her mental impairments. In February 1990, she attempted suicide. In May 1990, the physician treating her carpal tunnel syndrome noted that she was feeling a great deal of depression, and he recommended she be evaluated and treated for depression. In March 1991, a physician consulting for the Secretary concluded that she was suffering from major depression and strongly encouraged urgent treatment. Between March and August 1991, three other physicians concluded that she was depressed, one of whom concluded that she suffered from major depression and considered her totally disabled.

In August 1991, on referral from the Secretary, she was examined by Elizabeth Rasmussen, Ph.D., a psychologist, and Marcus Barker, M.D., a psychiatrist. Dr. Rasmussen assessed Ms. Cruse as follows:

> She has reported a recent history of being extremely depressed with reported suicide ideation, currently reports being fairly depressed and suicidal. The current assessment further indicates that she has borderline intellectual skills and while she is not organic, I suspect she has marginal resources cognitively to cope with all that is going on with her. I would further hypothesize she has not truly accepted the fact that she does have some limitations in terms of her skills and abilities. She does have cognitive and reasoning skills. She does have decision making abilities. It is thought she is capable of managing money benefits in her own best interest.

Appellant's App. at 391. Dr. Barker's impression on examining Ms. Cruse was that "this is a major depression. She was tearful throughout a great deal of the session. I also think that she is potentially suicidal." *Id.* at 397.

The ALJ concluded that while Ms. Cruse's physical and mental impairments were severe, the impairments neither alone nor in combination met the Listing of Impairments found in 20 C.F.R. Pt. 404, Subpt. P, App. 1. The impairments did, however, prevent her from performing her past relevant work, thus shifting the burden to the Secretary at the final stage of the five-step sequential analysis to show that there were jobs available that she could perform. *See Williams v. Bowen,* 844 F.2d 748, 750–52 (10th Cir. 1988) (describing the five-step analysis). The ALJ concluded that she had the "intellectual capacity to perform unskilled work and a wide range of semiskilled work." Appellant's App. at 26. He also concluded she could do the full range of light work reduced only by her inability to deal with unusually stressful situations. Based on her age, education, work experience, and capacity for light work, the ALJ found that the Medical–Vocational Guidelines (Grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rules 202.18 and 19, would direct a finding of not disabled. Considering the limitation on her ability to do light work, and the testimony of a vocational expert, the ALJ found that there were a significant number of jobs she could perform, such as gate tender, order caller, folder, and masker. He therefore concluded that she was not disabled and not entitled to disability benefits.

We review the Secretary's decision to deny benefits to determine whether it is supported by substantial evidence and

**1.** After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed.R.App.P. 34(f) and 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.

whether she applied the correct legal standards. *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir.1994). We closely examine the record as a whole to determine whether substantial evidence supports the Secretary's decision, and we fully consider the evidence that detracts from her decision. *Id.* Incorrect application or insufficient evidence of correct application of governing legal standards is grounds for reversal. *Id.*

Ms. Cruse raises two issues on appeal. First, she contends that the Secretary failed to properly consider her mental impairment when determining whether she met the listing requirements for affective disorders, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. Second, she contends that even if she does not meet the listing requirements, the Secretary failed to recognize the effect of her mental impairment on her ability to perform light work.

■ When there is evidence of a mental impairment that allegedly prevents a claimant from working, the Secretary must follow the procedure for evaluating mental impairments set forth in 20 C.F.R. § 404.1520a and the Listing of Impairments and document the procedure accordingly. *Andrade v. Secretary of Health & Human Servs.*, 985 F.2d 1045, 1048 (10th Cir.1993). This procedure first requires the Secretary to determine the presence or absence of "certain medical findings which have been found especially relevant to the ability to work," sometimes referred to as the "Part A" criteria. 20 C.F.R. § 404.1520a(b)(2). The Secretary must then evaluate the degree of functional loss resulting from the impairment, using the "Part B" criteria. § 404.1520a(b)(3). To record her conclusions, the Secretary then prepares a standard document called a Psychiatric Review Technique Form (PRT form) that tracks the listing requirements and evaluates the claimant under the Part A and B criteria. *See Woody v. Secretary of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir.1988); 20 C.F.R. § 404.1520a(d). At the ALJ hearing level, the regulations allow the ALJ to complete the PRT form with or without the assistance of a medical advisor and require the ALJ to attach the form to his or her written decision. *Id.* In this case, the ALJ completed the PRT form himself without assistance from a medical advisor. Appellant's App. at 28–31.

■ As applicable to analysis of affective disorders under § 12.04, the Part A criteria ask whether there is evidence of an affective disorder. The ALJ concluded that there was, noting that Ms. Cruse's depression was characterized by anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, decreased energy, and thoughts of suicide. The record contains substantial (if not overwhelming) evidence to support this aspect of the ALJ's conclusion.

■ To meet the listing requirements under the Part B criteria regarding the severity of the impairment, the condition or impairment must result in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Frequent deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation (decompensation) or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. § 404.1520a(b)(3); *id.* Pt. 404, Subpt. P, App. 1, § 12.04 B. The ALJ concluded that Ms. Cruse had only "moderate" restrictions on her activities of daily living and "moderate" difficulties in maintaining social functioning, "seldom" had deficiencies of concentration, persistence or pace, and "never" had episodes of deterioration or decompensation. Appellant's App. at 30–31.

We see several problems with the ALJ's analysis. Obviously, the record must contain substantial competent evidence to support the conclusions recorded on the PRT form. *Washington*, 37 F.3d at 1442. Moreover, if the ALJ prepares the form himself, he must

"discuss in his opinion the evidence he considered in reaching the conclusions expressed on the form." *Id.* (quotation omitted). The ALJ failed to do that. In his written opinion, the ALJ repeated the conclusions indicated on the PRT form, but only generally discussed the evidence of Ms. Cruse's mental impairment. He did not relate that evidence to his conclusions. More importantly, we have serious doubts whether there is substantial evidence to support his conclusion.

Though the Secretary referred Ms. Cruse to Drs. Rasmussen and Barker and could have requested them to evaluate her based on the listing requirements and complete PRT forms, they instead completed forms called "Medical Assessment of Ability To Do Work–Related Activities (Mental)." And as we have pointed out before, "[u]nfortunately for purposes of our review, ... the forms Dr. Rasmussen and Dr. Barker filled out in [claimant's] behalf do not match the four requirements of section 12.04 B" and the PRT form. *Hargis v. Sullivan,* 945 F.2d 1482, 1488 (10th Cir.1991). Not only do these forms hamper our review, but they hamper an ALJ's review as well.

■ The mental assessment forms are designed "[t]o determine this individual's ability to do work-related activities on a day-to-day basis in a regular work setting." Appellant's. App. at 393, 398. Instead of seeking data directly tied to the severity of the impairment under Part B of the listing requirements, the mental assessment forms ask for evaluations of a claimant's abilities in three work-related areas: making occupational adjustments, making performance adjustments, and making personal-social adjustments. Then, rather than evaluating the severity of a claimant's functional impairments using the same terms as the listing requirements, the mental assessment forms evaluate the claimant's abilities as "unlimited/very good," "good," "fair," and "poor or none." Moreover, the forms' definition of "fair" is misleading. Though describing a functional ability as "fair" would imply no disabling impair-

ment, "fair" is defined to mean: "Ability to function in this area is seriously limited but not precluded." *Id.* We conclude that "seriously limited but not precluded" is essentially the same as the listing requirements' definition of the term "marked:"

> Where "marked" is used as a standard for measuring the degree of limitation, it means more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired or even where only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively.

§ 12.00 C. A "marked" impairment represents a degree of disability that satisfies two of the four listing requirements. *Id.*

The ALJ misinterpreted Drs. Rasmussen's and Barker's evaluations of Ms. Cruse's abilities to the extent they described those abilities as "fair." In his written decision, he stated that "[t]he claimant's ability to perform work related activities from a mental stand point were rated 'good' or 'fair' in all categories." Appellant's App. at 21.[2] The ALJ apparently considered "fair" as being evidence of ability. As that term is defined on the medical assessment form, we hold it is evidence of *dis*ability.

Looking at Drs. Rasmussen's and Barker's assessments in that light, there appears to be evidence that Ms. Cruse meets the listing requirements. For example, deficiencies in concentration, persistence and pace "refer to the ability to sustain focused attention sufficiently long to permit the timely completion of tasks commonly found in work settings." § 12.00 C. Both Drs. Rasmussen and Barker found Ms. Cruse to have seriously limited ("fair") abilities to deal with work stresses, function independently, maintain attention/concentration, demonstrate reliability and understand anything more than simple job instructions. Similarly, deterioration or decompensation "refers to repeated failure to adapt to stressful circumstances which cause the individual either to withdraw from that

---

2. That statement is not entirely correct. Dr. Barker rated Ms. Cruse's ability to carry out complex job instructions as poor/none ("No useful ability in this area." Appellant's App. at 398.). Dr. Rasmussen rated her ability in a

number of areas as on the line between fair and poor/none. Even "good" is not as positive an evaluation as it might imply. "Good" is defined to mean "[a]bility to function in this area is limited but satisfactory." *Id.*

situation or to experience exacerbation of signs and symptoms (i.e., decompensation) with an accompanying difficulty in maintaining activities of daily living, social relationships, and/or maintaining concentration, persistence, or pace (i.e., deterioration ...)." *Id.* Drs. Rasmussen and Barker agreed that Ms. Cruse's abilities to behave in an emotionally stable manner, relate predictably in social situations, and generally deal with work stresses were seriously limited.[3]

We thus agree with Ms. Cruse that the Secretary improperly considered the evidence at step three. We also agree that this error tainted the step-five analysis. At step five, the ALJ concluded that she could perform a full range of light work as long as that work was not performed in "unusually stressful situations." Appellant's App. at 26.[4]

Clearly there is evidence of a severe mental impairment, which is a nonexertional impairment. *See Hargis*, 945 F.2d at 1491. When the listing requirements for mental disorders are not met, but the impairment is nonetheless severe, "[t]he determination of mental [residual functional capacity] is crucial to evaluation of an individual's capacity to engage in substantial gainful work activity." § 12.00 A. And when, as here, both exertional and nonexertional impairments diminish a claimant's residual functional capacity, "the Secretary must produce expert vocational testimony or other similar evidence to establish the existence of jobs in the national economy." *Hargis*, 945 F.2d at 1491.

The ALJ did solicit testimony from a vocational expert concerning Ms. Cruse's ability to perform certain jobs. However, his questioning related only to various exertional impairments; he did not question the vocational expert concerning the effect her mental impairments would have on her ability to perform these jobs.[5] The ALJ's "failure to recognize any mental impairment affecting the claimant's ability to perform ... work is, in our estimation, not supported by substantial evidence or correct legal standards." *Id.* at 1492. Thus, the step-five determination of no disability is also error.

Because of the errors at steps three and five, we REVERSE the district court's order and REMAND the case to the Secretary for further consideration of Ms. Cruse's mental impairment.

---

3. We realize that the standards for measuring the degree of limitation for deficiencies in concentration, persistence or pace and for episodes of deterioration and decompensation are not "marked" but are "frequent" and "repeated" respectively. Describing an ability as "fair" does not correlate as well with "frequent" and "repeated" as it does with "marked." This difficulty in correlation is one of the primary reasons why we consider the Secretary's use of the mental assessment forms to be "unfortunate." Nonetheless, having only "fair" abilities in areas relevant to the assessments for deficiencies of concentration and episodes of deterioration and decompensation clearly is evidence of severe functional limitations.

4. Ms. Cruse does not challenge the ALJ's conclusion that she has the exertional capacity to per-

form light work. She also does not challenge the ALJ's conclusion that she could perform semi-skilled work. We note that the district court found this conclusion to be error, but considered it harmless because the ALJ also found she could perform unskilled work.

5. The only reference to any possible mental difficulty the ALJ made during his questioning of the vocational expert was asking the expert whether a gate-tending job was low stress. Ms. Cruse's attorney also asked the expert whether her inability to deal with the public on an ongoing basis would affect her ability to do certain jobs. The expert testified that it would not. We do not consider the ALJ's conclusion that Ms. Cruse could only perform "low stress" jobs to be full consideration of her mental impairment.