Gayland R. TIBBITS, Plaintiff,

v.

Donna E. SHALALA, Secretary of Health and Human Services, Defendant.

No. 94–4133–SAC.

United States District Court,
D. Kansas.

March 28, 1995.

Lynette F. Petty, Washburn University School of Law, Topeka, KS, for plaintiff.

Jackie A. Rapstine, Office of U.S. Atty., Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

This is an action to review the final decision of the Secretary of Health Human Services [42 U.S.C. § 405(g) ] denying disability insurance and supplemental security income benefits to the plaintiff, Gayland R. Tibbits. The case is ripe for decision on the plaintiff's motion for summary judgment (Dk. 7) and on the Secretary's motion for an order affirming the Secretary's decision (Dk. 9).[1]

On August 21, 1992, Tibbits filed his applications for disability insurance and supplemental security income benefits. On the latter application, Tibbits alleged a learning disability from birth. Tibbits' claims were denied initially and on reconsideration. Following a hearing held on November 17, 1993, the administrative law judge (ALJ) issued his decision finding that Tibbits was not under a "disability" at any time from the alleged onset date through the date of the ALJ's decision. On June 21, 1994, the Appeals Council denied Tibbits' request for review. Consequently, the ALJ's decision stands as the Secretary's final decision.

## STANDARD OF REVIEW

■ The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that "the finding of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is more than a scintilla and is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401–02, 91 S.Ct. 1420, 1427–28, 28 L.Ed.2d 842 (1971); *Ray v. Bowen,* 865 F.2d 222, 224 (10th Cir.1989). "A finding of ' "no substantial evidence" will be found only where there is a "conspicuous absence of credible choices" or "no contrary medical evidence." ' " *Trimiar v. Sullivan,* 966 F.2d 1326, 1328 (10th Cir.1992) (quoting *Hames v. Heckler,* 707 F.2d 162, 164 (5th Cir.1983) (quoting *Hemphill v. Weinberger,* 483 F.2d 1137 (5th Cir.1973)). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir.1994) (citation omitted).

■ The court's review also extends to determining whether the Secretary applied the correct legal standards. *Washington v. Shalala,* 37 F.3d 1437, 1439 (10th Cir.1994). Besides the lack of substantial evidence, reversal may be appropriate when the Secretary uses the wrong legal standards or the Secretary fails to demonstrate reliance on the correct legal standards. *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.1994).

The court's duty to assess whether substantial evidence exists:

"is not merely a quantitative exercise. Evidence is not substantial 'if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.' "

*Gossett v. Bowen,* 862 F.2d 802, 805 (10th Cir.1988) (quoting *Fulton v. Heckler,* 760 F.2d 1052, 1055 (10th Cir.1985)). The court is not to reweigh the evidence or substitute its judgment for the Secretary's. *Glass v. Shalala,* 43 F.3d at 1395. The court typically defers to the ALJ on issues of witness credi-

---

1. The parties appear to have followed D.Kan. Rule 503 which provides for the filing ·of "an appropriate dispositive motion and memorandum" for a social security appeal. The Tenth Circuit in *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1579 n. 29 (10th Cir.1994), disapproved this rule and, specifically, the motion practice under it. The court is in the process of changing D.Kan.Rule 503 to comply with the holding in *Olenhouse* and to conform with Fed. R.App.P. 15. For purposes of the present appeal, the court attaches no legal significance to the dispositive motions that accompany the parties' memoranda. The court intends to follow the well-established standard of review for social security appeals and to rely only on what evidence is found within the administrative record.

bility. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1498 (10th Cir.1992). The courts, however, do not mechanically accept the Secretary's findings. *Claassen v. Heckler,* 600 F.Supp. 1507, 1509 (D.Kan.1985); *see Ehrhart v. Secretary of Health & Human Services,* 969 F.2d 534, 538 (7th Cir.1992) ("By the same token, we must do more than merely rubber stamp the decisions of the Secretary." (citation omitted)). Nor will the findings be affirmed by isolating facts and labelling them substantial evidence, as the court must scrutinize the entire record in determining whether the Secretary's conclusions are rational. *Holloway v. Heckler,* 607 F.Supp. 71, 72 (D.Kan.1985). " 'We examine the record as a whole, including whatever in the record fairly detracts from the weight of the Secretary's decision and, on that basis determine if the substantiality of the evidence test has been met.' " *Glenn v. Shalala,* 21 F.3d 983, 984 (10th Cir.1994) (quoting *Casias v. Secretary of Health & Human Services,* 933 F.2d 799, 800–01 (10th Cir.1991)); *see Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

■ For evaluating a claim of disability, the Secretary has developed a five-step sequential process. *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987). This process comes to an end if at any point the Secretary determines the claimant is disabled or not. *Thompson v. Sullivan,* 987 F.2d 1482, 1486 (10th Cir.1993). The first four steps are not at issue in this appeal. The ALJ denied benefits here at step five. Once the claimant proves his disability prevents him from engaging in his prior work for a continuous period of twelve months, the burden shifts to the Secretary to show that the claimant has the residual functional capacity ("RFC") to do other work that exists in the national economy. *Thompson,* 987 F.2d at 1487. RFC is "what the claimant can still do despite his ... limitations." *Id.* The Secretary satisfies this burden of proving RFC and existing jobs if substantial evidence supports her findings. *Id.*

## ALJ'S DECISION

In his order of January 23, 1994, the ALJ made the following findings:

1. The claimant met the earnings requirements of the Act on June 30, 1991, the date he stated he became unable to work, and continued to meet them through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since June 30, 1991.

3. The medical evidence establishes that the claimant has the following severe impairments: low to average memory functioning, borderline to low average intellectual functioning, a dependent personality disorder and alcohol and marijuana abuse in total remission. Nevertheless, he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's testimony is not found credible when considered in light of the medical signs and findings, history of medical treatment, reports of treating and examining physicians and the inconsistencies in the claimant's testimony, all of which is discussed more fully in the Rationale section of this decision.

5. The claimant has the residual functional capacity to perform work-related activities except for work involving lifting or carrying more than 50 pounds maximum occasionally and 20 pounds frequently, requiring limited contact with the public, having a limited ability to read and write, being able to understand simple instructions and being able to learn and retain new noncomplex information (20 CFR 404.1545 and 416.945).

6. The claimant is unable to perform his past relevant work as a fast food worker, janitor and construction helper.

7. The claimant is 31 years old, which is defined as a younger individual (20 CFR 404. 1563 and 416.963), and he has a limited education in special edu-

cation classes (20 CFR 404.1564 and 416.964).

8. The claimant has no acquired work skills which are transferable to the skilled or semi-skilled work functions of other work within his residual functional capacity (20 CFR 404.1568 and 416.968).

9. After considering the vocational expert's testimony in conjunction with the claimant's above described residual functional capacity for less than the full range of medium work and his age, education, past relevant work and non-exertional impairments, the undersigned Administrative Law Judge is persuaded that the claimant would be able to make a vocational adjustment to work which exists in significant numbers in the local and national economies.

10. The claimant has not been under a "disability," as defined in the Social Security Act, as amended, at anytime since his alleged onset date of disability of June 30, 1991, and through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

The claimant argues the ALJ erred in using the criteria from *Luna v. Bowen,* 834 F.2d 161 (10th Cir.1987), as the legal standard for evaluating his mental impairment and credibility, in omitting from his written rationale any discussion of the four criteria listed by the regulations governing the evaluation of a mental impairment, in finding that the plaintiff's mental impairment was not disabling, in treating a consulting psychologist as a treating psychologist, in not fully developing the record, in posing an inadequate hypothetical, and in isolating and abstracting evidence rather than considering it as a whole. As background to its discussion of these legal issues, the court summarizes those events and medical records relevant to the plaintiff's mental condition.

**FACTS**

At the time of the hearing, Tibbits was a thirty-one year old single parent of two children. He lives in a house with his six-year old daughter and four-year old son. With assistance from his family, Tibbits is able to do housework such as washing the laundry, preparing the children's meals, bathing the children, and dressing the children for school in the morning. He relies on his mother for instruction and supervision in completing his housework. He owns and drives a car. Tibbits has friends that visit him or he visits on occasion to play cards or dominoes.

Tibbits attended special education classes, but his schooling ended at the ninth grade. Testing in 1989 revealed that he reads at the beginning fourth grade level, spells at below a third grade level, and does math at the beginning fourth grade level. He is unable to complete most job applications and to read many manuals and instruction sheets. He can read only portions of the local newspaper. His writing is poor, and he cannot remember ever writing a letter. He often seeks help from his mother to read and explain written material.

The testing in 1989 showed that Tibbits functions within the borderline mentally retarded range. His full scale IQ was 73, his verbal IQ was 71, and his performance IQ was 80.

Tibbits' work history dates back to June of 1987 and continues through November of 1991. During that period of almost four and one-half years, Tibbits worked for seven different employers. For only one of those employers did he work for more than a year. He worked approximately one and one-half years for Taco Tico in preparing food and running the cash register at the drive-through window. The other positions, such as carrying out groceries and janitorial work, he held for as little several weeks to several months.

Tibbits received vocational rehabilitation services through the Kansas Department of Social and Rehabilitation Services (SRS). As part of this SRS program, Tibbits was referred for a psychological evaluation in 1989 by Stanley Mintz, Ph.D., a licensed clinical psychologist. At that time, Mintz offered these conclusions and recommendations:

This is a very dependent individual who exhibits an agitated depression. The depression, I feel, is of longstanding duration, but is exaggerated by his current

crisis situation in terms of his family dynamics.... He shows instability in terms of intimate relationships. He also shows instability in terms of job functioning which continues to this present time.

....

I view Mr. Tibbits as a dependent, immature young man who would have difficulty functioning autonomously at this time. I see him as essentially a fragile client, who could decompensate further under stress. He functions within the Borderline intellectual range. He does appear motivated to work and, in fact, some work with supervision and perhaps job coach or other support would be therapeutic and useful for him. I would not place him in any job which is unfamiliar or stressful or requires much skill or training at this time. I would strongly agree that he should be in counseling at this time, that his dependency, reality orientation, crisis, and alcohol problems should all be addressed. I feel that he will require a fairly long-term (perhaps six months to a year) of supportive counseling, but that the counseling and other support in terms of activities of daily living can be helpful to him. He also might benefit from training in independent living tasks and perhaps parenting skills. In summary, I see this as a "needy" client who will require a broad range of interventions to be successful. I am somewhat guarded about his ability to be fully consistent in a work effort at this time, although certainly he would benefit from working. In the intermediate and long term, his prospects for stable work and further training would be brighter.

(Hrg.Dk. 120–21). His diagnostic impressions were borderline mentally retarded intellectual functioning, dysthymic disorder, and dependent personality disorder. Mintz further observed that Tibbits lacked the ability "to complete most job applications or similar materials," and "to read many manuals or instruction sheets," and that Tibbits "would have difficulty with common number concepts except simple arithmetic and addition and subtraction." (Hrg.Dk. 120).

While still working at Taco Tico, Tibbits attended the job club meetings offered in conjunction with the vocational rehabilitation program. A referral organization placed Tibbits as a grocery carry out person under the supervision of a job coach. Satisfied with Tibbits' work during the initial test period, the grocery store hired him. He worked part-time for two weeks. But on his first day of full-time work, he missed work and called in with car problems. Two days later, Tibbits suddenly quit his job. In November of 1990, the job placement specialist terminated Tibbits' case noting that he was not job ready and not cooperative. In March of 1992, the Kansas Rehabilitation Services closed Tibbits' vocational rehabilitation case for his failure to respond to his counselor's communications.

In a conversation with a member of the disability examiner's staff, Tibbits' former supervisor at Taco Tico said that Tibbits' job tasks had been "fairly simple." (Hrg.Dk. 130). The supervisor observed that Tibbits had completed his assigned tasks "if he was followed up on ... if he knew he wasn't going to be checked, he wouldn't do the tasks correctly or timely." (Hrg.Dk. 130). The supervisor also said that Tibbits had needed "frequent prodding" but not "constant supervision." "He was able to concentrate adequately, was able to follow instructions and learn new tasks, but was one of those who needed continual 'support and direction' to stay on task." (Hrg.Dk. 130). The supervisor indicated that Tibbits had shown a lack of respect towards his supervisors. It was the supervisor's opinion that "working hard was not a priority with" Tibbits. *Id.* While he had seemed to get along with co-workers, Tibbits had difficulty dealing with the public and being friendly with them. Towards the end of Tibbits' employment, the supervisor had observed a noticeable change in Tibbits' "commitment level" and increased absences.

Linda Dunn, Ph.D., a licensed psychologist, performed a consultative mental status examination and limited psychological testing of Tibbits. She reported that Tibbits told her that he had been unable to maintain a job because he is a slow learner and a slow worker. Her observation was that Tibbits "thinking was logical and coherent, but there was a paucity of content. His thinking is

simplistic and literal." (Hrg.Dk. 129). Though Tibbits' speech had a normal rate and flow, Dunn found him to have "poor expressive language skills" and "a very slow response time." (Hrg.Dk. 129). She said her findings were consistent with Mintz's findings regarding Tibbits' judgment, reasoning and language skills. She further found that Tibbits' condition at the time of her examination did not warrant a diagnosis of depression or dysthymia. "Mr. Tibbits' memory functioning exceeds the reported results of his intellectual functioning. The results of the memory test place him in the average range, which indicates that he would be capable of learning and retaining new information, although he does better when aided by visual cues." (Hrg.Dk. 124). Dunn accepted as fact that Tibbits had "had difficulty holding a job ... because he ... [was] too slow." (Hrg.Dk. 125). Dunn opined that Tibbits "would do best in a manual labor-type situation as opposed to work that relied on intellectual or verbal skills. However, he would not do well in a situation which placed a premium on speed." (Hrg.Dk. 125). In light of Tibbits' statements that he had friends and a close relationship with his family, Dunn concluded that Tibbits social functioning "appears adequate." (Hr.Dk. 129)

Tibbits' case manager at Family Service and Guidance observed that Tibbits functioned well with a routine like the one set up and maintained at his home and with his children. The manager cautioned that a change in Tibbits' daily routine would "throw him off for days and cause him frustration." (Hrg.Dk. 149). The manager found that Tibbits needs constant reminders on bills and on any activity outside of the normal routine. The manager considered Tibbits to be "a person who would function within a sheltered living environment very well and this is the environment that has been set up for him by his family and family support members." (Hrg.Dk. 149).

At the hearing, Tibbits was asked to explain in his own words why he was unable to work; he answered: "I need someone to coach me, you know, into things that they show me how to do and I'll do it, you know. But then there's periods where I'll forget how to do it, or I'll need to go get ... advice from people to coach me and show me how to do this." (Hrg.Dk. 36). Tibbits said he lasted longer at Taco Tico than at his other jobs because two of his co-workers were also his friends and had helped him at work. After his friends left Taco Tico, Tibbits said he began having problems. Tibbits testified to having a short temper that caused him to fight with his supervisors and co-workers. Tibbits said that he was fired from Taco Tico for arguing with his supervisor and that he then physically attacked his supervisor for firing him. Tibbits also said that he struck a customer and fought a co-worker in the parking lot. The evidence of record does not confirm or controvert Tibbits' testimony about these particular incidents during his Taco Tico employment.

Tibbits testified that he had a "tendency" to forget what he had been doing before he was distracted. (Hrg.Dk. 36). Tibbits believed this tendency would prevent him from being a dishwasher. Tibbits gave as an example of his tendency that he will start to clean his house but after becoming involved in something he will forget to finish his cleaning for days. Tibbits did not call any witnesses. He was represented by counsel at the hearing.

The ALJ also heard testimony from a consulting vocational expert. The expert had read the written evidence of record and had heard Tibbits' testimony. The ALJ asked the following hypothetical question:

[I]f I find in this case that Mr. Tibbits is 31 years old and has 9th grade education by virtue of special education, that he is—does in fact have a low IQ, with a verbal IQ of 71, a full scale IQ of 73, and his performance IQ of 80. And, that he—and if I find further that he is the victim of mild mental retardation, he has a history of alcohol abuse and marijuana abuse, that, but that these habits are either in remission or in any affect would not impair his ability to do work related activities at this point. That, in addition to his low level of mentation, or his—that is his mild mental retardation, that he has only the most limited ability to read and write. That he has a personality disorder which does rise

to various mental aberrations, but that considering his condition, in general that he is physically healthy and physically fit, and has no particular physical impairment that would preclude in his ability to do physical labor, and that he could at least lift up to 50 pounds on occasion and perhaps 20 pounds more frequently. That notwithstanding his mental retardation and limited educational attainments, marginal educational attainments, that exertional functioning is adequate, and that he has the ability to learn and retain new information, that, that, that is noncomplex information and that given in most situations, he would be able to understand simple job instructions. Given those restrictions and limitations, what jobs could such an individual do in your opinion?

(Hrg.Dk. 49–50). The expert answered that Tibbits could work as a machine feeder, kitchen helper, laundry worker and janitor. All of these jobs are considered to require a medium exertional level. The expert explained that the kitchen helper position, unlike Tibbits' former employment at Taco Tico, would have no public contact. The expert agreed that if Tibbits had difficulty dealing with supervisors or attending work then these difficulties would negatively impact his ability to retain these jobs. Tibbits' counsel did not ask the expert any questions.

## MERITS

■ According to Tibbits, the ALJ evaluated his claim of disability using the criteria from *Luna v. Bowen,* 834 F.2d 161 (10th Cir.1987). Tibbits argues the holding and factors found in *Luna,* as well as the regulations and rulings cited by the ALJ, principally address the symptom of pain and the evaluation process to be used in determining the credibility of a claimant's pain complaints. Tibbits maintains the ALJ erred in looking at these legal standards and in organizing his written decision around those criteria. Tibbits insists the ALJ failed to follow the process and apply the standards governing the evaluation of a mental impairment.

Besides the five step sequential process outlined earlier, whenever an adult claimant alleges a mental impairment, "a special procedure *must* be followed ... at each level of administrative review." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). In adopting this additional procedure, the Secretary intended "to ensure that all evidence needed for the evaluation of a claim which involves a mental impairment is obtained and evaluated." *Hargis v. Sullivan,* 945 F.2d 1482, 1487 (10th Cir.1991). "When a record 'contains evidence of a mental impairment that allegedly prevented claimant from working, the Secretary [is] required to follow the procedure for evaluating the potential mental impairment set forth in his regulations and to document the procedure accordingly. *See* 20 C.F.R. § 404.1520a.'" *Andrade v. Secretary of Health and Human Services,* 985 F.2d 1045, 1048 (10th Cir.1993) (quoting *Hill v. Sullivan,* 924 F.2d 972, 975 (10th Cir.1991)).

The procedure requires first a careful review of the case record to determine if a mental impairment exists. 20 C.F.R. § 404.1520a(b)(1). Upon finding a mental impairment, the Secretary must:

determine the presence or absence of 'certain medical findings which have been found especially relevant to the ability to work,' sometimes referred to as the 'Part A' criteria. 20 C.F.R. § 404.1520a(b)(2). The Secretary must then evaluate the degree of functional loss resulting from the impairment, using the 'Part B' criteria. 20 C.F.R. § 404.1520a(b)(3). To record her conclusions, the Secretary then prepares a standard document called a Psychiatric Review Technique Form (PRT form) that tracks the listing requirements and evaluates the claimant under the Part A and B criteria. *See Woody v. Secretary of Health & Human Servs.,* 859 F.2d 1156, 1159 (3rd Cir.1988); 20 C.F.R. § 404.1520a(d). At the ALJ hearing level, the regulations allow the ALJ to complete the PRT form with or without the assistance of a medical advisor and require the ALJ to attach the form to his or her written decision. *Id.*

*Cruse v. United States Department of Health and Human Services,* 49 F.3d 614, 617 (10th Cir.1995). The ALJ here completed and appended to his decision a Psychiatric Review Technique (PRT) Form. As it appears from the face of the PRT form, the ALJ completed it himself.

The Part A criteria on the PRT form ask if there is evidence of certain disorders. On the PRT form here, the ALJ found evidence of mental retardation. He noted that Tibbits had borderline to low average intellectual functioning. The ALJ also found evidence of a personality disorder and marked the diagnosis of dependent personality disorder. The record is replete with evidence to support both findings. Tibbits does not argue that the ALJ failed to account for evidence of other disorders.

In rating the degree of functional loss, the Secretary considers the following four essential areas of function: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings. 20 C.F.R. § 404.1520a(b)(3). If the ratings of the first two areas is none or slight and of the next two areas is never or seldom, then the Secretary may conclude there is no severe mental impairment unless the evidence otherwise shows the claimant's mental ability significantly limits performance of "basic work activities." 20 C.F.R. § 404.1520a(c)(1). These "basic work activities" are "the abilities and aptitudes necessary to do most jobs," and they include "[c]apacities for seeing, hearing, and speaking," "[u]nderstanding, carrying out, and remembering simple instructions," "[u]se of judgment," "[r]esponding appropriately to supervision, co-workers and usual work situations," and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b).

The ALJ here completed the PRT form marking "slight" on the first two areas of daily living and social functioning; "seldom" on the third area of concentration, persistence or pace; and "never" on the fourth area of deterioration or decompensation in work. The ALJ, however, found that:

the medical evidence establishes that claimant has the following severe impairments: low to average memory functioning, borderline to low average intellectual functioning, a dependent personality disorder and alcohol and marijuana abuse in total remission. Nevertheless, he does not have an impairment or combination of impairments listed, or medically equal to one

listed in Appendix 1, Subpart P, Regulations NO. 4.

(Hrg.Dk. 21). While stating these conclusions, the ALJ never offers his reasons for them anywhere in the written decision.

Having found Tibbits to have a severe impairment that does not meet or equal the listings, the ALJ was required by the regulations next to assess Tibbits' residual functional capacity (RFC). 20 C.F.R. § 404.1520a(c)(3). "The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). The RFC assessment "complements the criteria" considered earlier and expands upon the "list of work-related capacities which may be impaired by mental disorder." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). The Tenth Circuit recently held:

In assessing a claimant's mental RFC, the ALJ should consider, among other things, the claimant's ability to engage in the activities of daily living; to interact appropriately with the public, supervisors, and co-workers; to focus long enough to complete tasks in a timely fashion; and to adapt to stressful circumstances without either withdrawing from the situation or experiencing increased signs and symptoms of the claimant's mental disorder. *Id.* [20 C.F.R. Pt. 404, Subpt. P, App.1] § 12.00(C).

*Washington v. Shalala,* 37 F.3d at 1440. The ALJ here found that Tibbits had the RFC to do medium level work "requiring limited contact with the public, having a limited ability to read and write, being able to understand simple instructions and being able to learn and retain new noncomplex information." (Hrg.Dk. 21).

To assure herself and others that this new procedure for evaluating mental impairments would be followed in each case, the Secretary required:

At all adjudicative levels we must, in each case, incorporate the pertinent findings and conclusions based on this procedure in our decision rationale. Our rationale must show the significant history, including examination, laboratory findings, and func-

tional limitations that we considered in reaching conclusions about the severity of the mental impairment(s).

20 C.F.R. § 404.1520a(c)(4).

Finally, as part of this detailed procedure, the regulation requires the completion of a " 'standard document,' ... called a 'Psychiatric Review Technique Form,' which is essentially a checklist that the tracks the requirements of the Listings of Mental Disorders." *Woody v. Secretary of Health and Human Services,* 859 F.2d 1156, 1159 (3rd Cir.1988) (citations omitted). The ALJ must append the PRT form to his decision. 20 C.F.R. 404.1520a(d)(2). The conclusions found on the PRT form must be supported by a substantial competent evidence. *Washington,* 37 F.3d at 1442. "[I]f the ALJ prepares the form himself, he must 'discuss in his opinion the evidence he considered in reaching the conclusions expressed on the form.' " *Cruse,* 49 F.3d at 617–18 (quoting *Washington,* 37 F.3d at 1442). In *Cruse,* the court was critical of the ALJ for only repeating his conclusions from the PRT form, for only generally discussing the evidence of mental impairment, and for not relating the evidence to his conclusions. *Id.* at 618.

The ALJ's written decision here suffers from the same shortcomings noted in *Cruse.* The ALJ's decision fails to discuss the particular evidence considered in support of his different conclusions on the PRT form. The decision echoes some of the conclusions indicated on the form without any further explanation or discussion. Two significant ratings contained on the PRT form are not even mentioned as conclusions in the ALJ's decision. The ALJ's rating of "seldom" on deficiencies of concentration, persistence or pace is not mentioned, explained or supported by the written decision. The same can be said about the ALJ's rating of "never" for episodes of deterioration or decompensation in work.[2] Like *Cruse,* the ALJ's decision fails to relate specific evidence to his conclusions recorded on the PRT form. In short, the ALJ utterly failed "to incorporate the perti-

nent findings and conclusions based on this [mental impairment evaluation] procedure in ... [his] decision rationale." 20 C.F.R. § 404.1520a(c)(4).

Instead of organizing his decision on the procedure outlined above and discussing the specific conclusions recorded on the PRT form, the ALJ here structured his entire decision on the criteria relevant in evaluating a claimant's subjective complaints of pain. In questioning the ALJ's choice of standards, the court is not discounting the importance of evaluating a claimant's credibility. Nor is the court saying that some of the same criteria used in testing pain complaints are not relevant in testing complaints of other symptoms. The court's criticism is with the ALJ's failure in his decision to incorporate the required procedure for evaluating mental impairments, to discuss the particular conclusions required by that procedure, and to relate the specific evidence to those conclusions. Not even once does the ALJ cite in his decision 20 C.F.R. § 404.1520a or 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. All of these shortcomings and circumstances create too many doubts for the court as to whether the ALJ followed the correct procedure and applied the appropriate legal standard in evaluating Tibbits' claimed mental impairment. The judicial review standard requires a reversal if the Secretary fails to demonstrate reliance on correct legal standards.

The centerpiece to the claimant's arguments on appeal is the ALJ's failure to follow this regulatory procedure and to make the findings required under this procedure. Yet for all the claimant's arguments, the Secretary nowhere attempts in her brief to explain or justify this glaring omission in the ALJ's written decision. Instead, the Secretary takes the same approach as the ALJ and simply ignores the regulatory procedure. Like the ALJ, the Secretary does not even cite these regulations and also does not demonstrate that these legal standards were cor-

---

**2.** Relevant to this rating is Tibbits' own testimony about his belligerent behavior towards a customer, co-worker and supervisor at Taco Tico. He also testified that the stress of work interferes with his limited parenting ability. The ALJ offers

no reason for not considering this evidence in its ranking on this category. At the reconsideration level, the physician completed the PRT form giving Tibbits a "once or twice" rating on this essential job function.

rectly applied in evaluating Tibbits' claimed mental impairment. Finally, the Secretary does not identify and relate substantial evidence from the record in support of the specific findings and conclusions required by these regulations. The court has no choice but to reverse and remand for additional proceedings.

Preoccupied with discounting Tibbits' credibility, the ALJ overlooked discussing such relevant factors as pace and episodes of deterioration. His written decision does not account for the uncontroverted testimony regarding Tibbits' slow response time and those incidents of deterioration marked by Tibbits' fighting with co-workers and supervisors, poor attendance, and lack of commitment. The ALJ's decision does not offer any reasonable ground for discounting Tibbits' need for routine and his frustration caused by changes in routine.[3] The consulting psychologist Dunn[4] confirmed Tibbits' "very slow response time." The record does not show that Dunn tested Tibbits or drew impressions regarding his need for a routine or ability to deal with others under stressful conditions. The ALJ's decision does not demonstrate that he meaningfully considered the evidence and factors of pace and episodes of deterioration in assessing Tibbits' RFC.

This case presents facts that call into doubt Tibbits' mental ability to maintain a job. " '[A] finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can *hold* whatever job he finds for a significant period of time.' " *Washington,* 37

F.3d at 1442 (quoting *Singletary v. Bowen,* 798 F.2d 818, 822 (5th Cir.1986)). On remand, the ALJ should address Tibbits' mental ability to hold a job considering his employment history and his lack of success with vocational rehabilitation services. "Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D). Finally, the court would expect that the ALJ on remand would ask a hypothetical question that accounted for Tibbits' slow response time and which defined "mental aberrations." While the vocational expert may have been familiar with the record, she made no mention of Tibbits' slow response time and had no basis for knowing what the ALJ meant by "mental aberrations."

IT IS THEREFORE ORDERED that the plaintiff's motion for summary judgment (Dk. 7) and the Secretary's motion to affirm (Dk. 9) are denied, and the case is remanded for further proceedings consistent with this opinion.

---

**3.** The uncontroverted evidence was that Tibbits' family provided him with a structured and sheltered living environment. The ALJ did not develop the record on this issue beyond accepting the letter from Tibbits' case manager at the Family Service and Guidance Center. The case manager confirmed Tibbits' dependency on his family members in caring for himself and his children. The ALJ apparently rejected this evidence of a sheltered living environment without giving any reason for doing so. In ignoring that evidence, the ALJ necessarily overstated Tibbits' functional capacity when he said it was demonstrated in part by Tibbits' ability to maintain a home and care for his children.

**4.** Among his reasons for discounting Tibbits' testimony, the ALJ noted that "[t]he claimant's allegations are unsupported by the opinion of the treating psychologist, ... and the failure of the treating psychologist of record to corroborate the claimant's allegations concerning his residual functional capacity." (Hrg.Dk. 19–20). The ALJ does not identify whom he believes was Tibbits' treating psychologist. The evidence of record does not show that Mintz or Dunn treated Tibbits for his mental condition.