**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 11 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

GEORGIA E. LAMB,

      Plaintiff-Appellant,

v.

JO ANNE B. BARNHART,
Commissioner, Social Security
Administration,

      Defendant-Appellee.

No. 03-7024
(D.C. No. 02-CV-392-P)
(E.D. Okla.)

**ORDER AND JUDGMENT** *

Before **O'BRIEN** and **BALDOCK** , Circuit Judges, and **BRORBY** , Senior Circuit Judge.

After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

---

\*     This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Plaintiff-appellant Georgia E. Lamb appeals the district court's order affirming the Social Security Commissioner's denial of her application for disability insurance benefits under the Social Security Act. We exercise jurisdiction under 42 U.S.C. § 405(g) and 28 U.S.C. § 1291. We reverse and remand for further proceedings.

## I.

Mrs. Lamb and her husband owned a dairy farm. On October 21, 1998, Mrs. Lamb injured her back and neck when a calf pen fell on her head and knocked her down. Mrs. Lamb's medical records document the treatment she has received through September 2001, and the records indicate the following.

Mrs. Lamb's main treating physician is Dr. Osborne, an osteopath. Dr. Osborne referred her to Dr. Duncan, a neurologist, and Dr. Duncan saw her in June and August 1999. *See* Aplee. Supp. App. at 124, 254, 260-61. Dr. Duncan's records indicate that MRIs of her spine showed a small central disc protrusion at T5-6 and osteophytes at C4-5 and C5-6, and he diagnosed cervical radiculopathy. *Id.* at 124, 254. Dr. Duncan's records indicate that Mrs. Lamb received epidural injections from another physician, but they did not lead to any consistent improvement in her pain. *Id.* at 124.

Dr. Duncan referred Mrs. Lamb to Dr. Pelofsky, a neurosurgeon, and Dr. Pelofsky saw her in September 1999 and January 2000. *Id.* at 170-71.

Dr. Pelofsky diagnosed cervical spondylosis at C4-5 and C5-6, with no evidence of active radiculopathy or myelopathy, *id.* at 170, and "complex regional pain syndrome involving her occipital region, her cervical region, her shoulders, and arms," *id.* at 171. Dr. Pelofsky noted, however, that "[n]eurologically, . . . her symptoms far exceed her neurologic findings." *Id.* Dr. Pelofsky also noted that Mrs. Lamb showed evidence of "significant depression," and he prescribed Zoloft to treat her depression. *Id.* at 170.

Dr. Pelofsky referred Mrs. Lamb to Dr. Eckman, a radiologist/pain management specialist, and Dr. Eckman treated her from September 1999 to December 1999. *Id.* at 128-37, 150-51, 202-03. Dr. Eckman's records indicate that an MRI of her cervical spine showed an anterior disc bulge at C5-6, but "no protrusions, outer annular tears, stenosis, or congenital abnormalities." *Id.* at 136. His records also indicate that an MRI of her thoracic spine showed a disc protrusion at T5-6. *Id.* Dr. Eckman diagnosed Mrs. Lamb as suffering from "complex regional pain syndrome, type I," *id.* at 128, which he also referred to as "sympathetically maintained pain syndrome," *id.* at 130. His records also document cervical disc disease with mild radicular signs and associated occipital neuralgia, *id.* at 128, and he gave Mrs. Lamb epidural and nerve block injections to treat her pain, *id.* at 128, 132. Although Dr. Eckman reported that Mrs. Lamb's case was "unusual" because her complaints of severe pain exceeded the objective

medical evidence, he also noted that the "symptom expression, muscle spasm and range of motion are dramatic to say nothing of the impact that this pain has had on this patient's life." *Id.* at 137. He further reported that he "was very impressed by the degree of pain and disability this obviously tough and sturdy woman was experiencing." *Id.* at 136.

Dr. Pelofsky also referred Mrs. Lamb to Dr. Hancock, a physical medicine and rehabilitation specialist, and she saw Dr. Hancock in January and February 2000. *Id.* at 138, 140-41. Dr. Hancock diagnosed cervical degenerative disc disease/cervical spondylosis, bilateral shoulder impingement, and sympathetically mediated pain of the left shoulder. *Id.* at 138, 141. She also noted that Mrs. Lamb suffers from depression and a sleep disorder. *Id.* at 138.

In February 2000, Dr. Hancock and Dr. Pelofsky referred Mrs. Lamb to Dr. Marshall, another pain management specialist, and Dr. Marshall treated her through September 2001. *Id.* at 142-46, 155, 157-59, 160-65, 297, 304-307, 318. Dr. Marshall's records confirm the protruding disc at T5-6, *id.* at 304-05, and he diagnosed recurrent thoracic radiculitis secondary to thoracic degenerative disc disease, *id.* at 305. He also diagnosed Mrs. Lamb as suffering from chronic regional pain syndrome. *Id.* at 142, 145, 164. Dr. Marshall implanted a spinal cord stimulator in her neck in June 2000, *id.* at 142-44, and he also gave her several epidural and nerve block injections, *id.* at 155, 157-58, 297, 306-07, 318.

Dr. Marshall's records indicate that the spinal cord stimulator helped to reduce her pain and make her more functional, but his records also document a number of continuing complaints regarding pain associated with her thoracic degenerative disc disease. *Id.* at 155, 157-58, 297, 304-305.

In March 2000, Dr. Marshall referred Mrs. Lamb to Dr. Nael for a psychiatric evaluation. *Id.* at 292-96. Dr. Nael diagnosed Mrs. Lamb as suffering from "major depression, moderate single episode, non-psychotic," and he rated her global assessment of functioning score at 60. *Id.* at 295. Dr. Nael also stated that Mrs. Lamb "needs to continue her medications and possibly follow-up psychiatrically for treatment of her depression." *Id.* at 296.

## II.

In February 2001, Mrs. Lamb filed an application for disability insurance benefits. After her claim was denied initially and on reconsideration, a de novo hearing was held before an administrative law judge (ALJ). In a decision dated January 15, 2002, the ALJ determined that Mrs. Lamb is not disabled and denied her application for benefits. In May 2002, the Appeals Council denied Mrs. Lamb's request for review of the ALJ's decision. Mrs. Lamb then filed a complaint in the district court. In January 2003, the district court entered an order affirming the ALJ's decision denying benefits. This appeal followed.

"To qualify for disability benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity." *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993). The Commissioner has established a five-step sequential evaluation process for determining whether a claimant is disabled. *Id.* In this case, the ALJ found at step two that Mrs. Lamb suffers from a severe impairment in the form of degenerative disc disease, but the ALJ denied benefits at step five, finding that she retains the residual functional capacity (RFC) to perform light work and is therefore not disabled under the medical-vocational guidelines (grids). *See* 20 C.F.R., Pt. 404, Subpt. P, App. 2 (2001).

We review the ALJ's decision only to determine whether his factual findings are supported by substantial evidence and whether he applied the correct legal standards. *See O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotations omitted). In making the substantial-evidence determination, we neither reweigh the evidence nor substitute our judgment for that of the ALJ. *See Thompson*, 987 F.2d at 1487.

Mrs. Lamb claims the ALJ erred by: (1) failing to properly consider Dr. Osborne's opinion that she is unable to perform even sedentary work;

-6-

(2) failing to properly assess her RFC; and (3) failing to determine whether she suffers from a severe mental impairment. We agree with Mrs. Lamb that the ALJ committed reversible error with respect to each of these points.

**A. Dr. Osborne's Opinion**

In deciding how much weight to give the opinion of a treating physician, an ALJ must first determine whether the opinion is entitled to "controlling weight." *See Watkins v. Barnhart*, __ F.3d __, 2003 WL 22855009, at *2 (10th Cir. Dec. 2, 2003). An ALJ is required to give the opinion of a treating physician controlling weight if it is both: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques;" and (2) "consistent with other substantial evidence in the record." *Id.* (quotation omitted). "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." *Id.*

Even if a treating physician's opinion is not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. [§§] 404.1527 and 416.927." *Id.* (quotation omitted). And, "[a]fter considering the pertinent factors, the ALJ must give good reasons . . . for the weight he ultimately assigns the opinion." *Id.* at *3 (quotation omitted). Further, "if the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so." *Id.* (quotation omitted). We have also held that an ALJ "may reject a treating

-7-

physician's opinion outright only on the basis of contradictory medical evidence and *not due to his or her own credibility judgments, speculation or lay opinion*." *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (quotation omitted).

In October 2001, Dr. Osborne filled out a form entitled "Medical Source Statement - Physical." *See* Aplee. Supp. App. at 301-02. With respect to her exertional limitations, the form states: (1) that Mrs. Lamb can stand, walk, or sit for a total of less than one hour during an eight-hour workday; (2) that she is limited in her ability to push or pull; and (3) that she can only occasionally lift less than ten pounds. *Id.* As noted by the ALJ in his decision, the limitations imposed by Dr. Osborne on standing, walking, and sitting indicate that Mrs. Lamb has "less than sedentary capability." *Id.* at 26. This is in conflict with the "Physical Residual Functional Capacity Assessment" forms that were completed by two non-examining medical consultants on behalf of the Commissioner, as both of the non-examining consultants found that Mrs. Lamb's exertional limitations do not prevent her from performing light work. *Id.* at 227-34, 235-42.

The ALJ characterized Mrs. Lamb's impairment as "degenerative disc disease," and he found that it was a severe impairment at step two, but that it did not meet or equal the listing for vertebrogenic disorders of the spine (Listing 1.05C) at step three. *Id.* at 25. After concluding that "Dr. Osborne's less than sedentary findings . . . are not supported by the medical record," *id.* at 26, the

ALJ found at step four that Mrs. Lamb retains the RFC to perform light work for an eight-hour workday, and he concluded that she is not disabled at step five based on the grids, *id.* at 26-27. The ALJ therefore completely rejected Dr. Osborne's opinion, and he apparently gave it no weight whatsoever.

The ALJ provided two reasons for his conclusion that Dr. Osborne's opinion is not supported by the medical record. First, he noted that "[m]agnetic resonance imaging did not show stenosis, herniation, damage to the spinal cord, or other developments necessary for Dr. Osborne's evaluation to be legitimate." *Id.* at 26. Second, he noted that "[b]oth [Mrs. Lamb] and her treating surgeon stated in the record that she received significant relief from the permanently implanted spinal cord stimulator." *Id.* Although he did not specifically tie his credibility determination to his evaluation of Dr. Osborne's opinion, the ALJ also found that Mrs. Lamb's claim that she is in constant pain "is not credible in view of the record's marking of her progress." *Id.*

Based on the record before this court, we conclude that these are not legitimate reasons for rejecting Dr. Osborne's opinion. To begin with, while the ALJ is correct that the record does not contain MRI evidence showing "stenosis, herniation, [or] damage to the spinal cord," this does not mean that Dr. Osborne's opinion that Mrs. Lamb cannot perform even sedentary work is unsupported. To the contrary, the ALJ committed reversible error by failing to analyze the specific

physical ailments that are documented in Mrs. Lamb's medical records. Specifically, in order to determine whether Dr. Osborne's opinion is entitled to controlling weight, the ALJ was required to analyze the physical ailments that are documented in Mrs. Lamb's medical records ( *i.e.*, degenerative disc disease and complex or chronic regional pain syndrome [1] and the pain and physical limitations related thereto) and determine, as a threshold matter, whether Dr. Osborne's opinion that those ailments are disabling is well supported and not inconsistent with other substantial evidence in the record. *See Watkins*, 2003 WL 22855009, at *2.

Moreover, the fact that Dr. Marshall's medical records indicate in very general terms that Mrs. Lamb had decreased pain and was functioning better after the spinal cord stimulator was implanted does not provide any specific or useful information regarding the physical limitations caused by her underlying back and neck problems. Consequently, the general references in Dr. Marshall's medical records do not provide a legitimate basis for rejecting Dr. Osborne's opinion. Similarly, the ALJ's conclusory assertion that Mrs. Lamb's medical records show "progress" is not a legitimate basis for rejecting Dr. Osborne's

---

[1] With respect to the diagnosis of complex or chronic regional pain syndrome, we note that there is a recent Social Security Ruling specifically addressing how ALJs are to evaluate this syndrome. *See* SSR 03-2p, *Evaluating Cases Involving Reflex Sympathetic Dystrophy Syndrome/Complex Regional Pain Syndrome*, 2003 WL 22399117 (Oct. 20, 2003).

opinion. Accordingly, because the ALJ failed to provide legitimate reasons for rejecting the opinion of Dr. Osborne, we must remand this case for a reevaluation of Dr. Osborne's opinion.

**B. ALJ's RFC Determination**

As set forth above, the ALJ rejected Dr. Osborne's opinion that Mrs. Lamb cannot perform even sedentary work, and the ALJ found that Mrs. Lamb has the RFC to perform light work. *See* Aplee. Supp. App. at 26-27. There is no competent medical evidence in the record to support the ALJ's light work determination because: (1) the RFC assessment forms that were prepared by the two non-examining agency physicians, *id.* at 227-34, 235-42, do not constitute substantial evidence since they are not accompanied by thorough written reports or persuasive testimony, *see Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987); and (2) leaving aside Dr. Osborne, none of the other doctors who have examined Mrs. Lamb have specifically addressed or defined her exertional limitations in terms of her ability to sit, stand, walk, lift, carry, push, and pull or her nonexertional limitations in terms of her ability to reach, handle, stoop, crouch, climb, etc., *see* 20 C.F.R. § 404.1569a (2001).

As a result, even if the ALJ determines on remand that he is not required to give controlling weight to the opinion of Dr. Osborne, the ALJ cannot then simply conclude, as it appears he did in the decision under review, that Mrs. Lamb is

therefore capable of performing light work. *See* Aplee Supp. App. at 26-27.

Instead, the ALJ must evaluate and make specific findings as to Mrs. Lamb's

physical RFC, *see Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996), and

the findings must be supported by substantial evidence, *see Haddock v. Apfel*, 196

F.3d 1084, 1088-89 (10th Cir. 1999).

Further, the ALJ must ensure that a sufficient record exists to evaluate

Mrs. Lamb's exertional and nonexertional limitations. *See* SSR 96-8p, 1996 WL

374184, *5 (July 2, 1996) (noting that ALJs "must . . . make every reasonable

effort to ensure that the file contains sufficient evidence to assess RFC," and that

"[t]he RFC assessment must address both the remaining exertional and

nonexertional capacities of the individual"). And, while the ALJ is not limited to

considering only medical evidence, *see* 20 C.F.R. § 404.1545(a) (2001) ("[RFC]

is an assessment based upon all of the relevant evidence."), the ALJ's duty to

develop the record may include obtaining additional medical evidence from Mrs.

Lamb's treating physicians or ordering a consultative examination if the record

does not otherwise contain sufficient evidence upon which to base an RFC

finding, *see* 20 C.F.R. § 404.1512(d)-(f) (2001).

### C. Alleged Mental Impairment

We conclude that the ALJ erred by failing to address whether Mrs. Lamb

suffers from a severe mental impairment. As noted above, Dr. Nael diagnosed

Mrs. Lamb as suffering from depression, and there are also references to the fact that she suffers from depression, and was prescribed Zoloft to treat her depression, in the records of Dr. Pelofsky and Dr. Hancock. Thus, there is sufficient evidence in the record to establish that Mrs. Lamb suffers from a mental impairment, and the ALJ therefore erred by failing to evaluate the severity of her mental impairment in accordance with the procedures set forth in 20 C.F.R. § 404.1520a (2001). *See Cruse v. United States Dep't of Health & Human Servs.*, 49 F.3d 614, 617 (10th Cir. 1995) ("When there is evidence of a mental impairment that allegedly prevents a claimant from working, the [ALJ] must follow the procedure for evaluating mental impairments set forth in 20 C.F.R. § 404.1520a and the Listing of Impairments and document the procedure accordingly.").

The order of the district court is REVERSED, and this case is REMANDED to the district court with instructions to remand the case to the Commissioner for further proceedings before the ALJ.

Entered for the Court

Wade Brorby
Senior Circuit Judge

-13-