Cheryl TOLBERT, Plaintiff,

v.

Kenneth S. APFEL, Commissioner of the Social Security Administration, Defendant.

No. 99–CV–637–J.

United States District Court, N.D. Oklahoma.

July 25, 2000.

Paul F. McTighe, Jr., Tulsa, OK, for plaintiff.

Peter Bernhardt, U.S. Atty., Tulsa, OK, for defendant.

### ORDER

JOYNER, United States Magistrate Judge.

Now before the Court is Plaintiff's appeal of a decision by the Commissioner of the Social Security Administration ("Commissioner") denying her disability insurance and supplemental security income benefits under Titles II and XVI of the Social Security Act. Using the Medical–

Vocational Guidelines ("the Grids"), the Administrative Law Judge ("ALJ"), James D. Jordan, denied benefits at step five of the sequential evaluation process used by the Commissioner to evaluate disability claims. The Appeals Council found no basis for changing the ALJ's decision. Consequently, the ALJ's decision is the Commissioner's final decision in this case.

The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work. Given her RFC, the ALJ determined that Plaintiff would not be able to perform her past relevant work as a nurse's aide, hotel maid or restaurant counter person. The ALJ then applied grid rule 201.21 which directed a finding of "not disabled."

On appeal, Plaintiff argues (1) that the ALJ's RFC determination is not supported by substantial evidence because (a) the ALJ ignored Plaintiff's mental impairments, (b) the ALJ failed to properly evaluate Plaintiff's credibility, and (c) the ALJ failed to consider the combined effect of Plaintiff's impairments; (2) the ALJ failed to evaluate whether Plaintiff's impairments meet or equal a listing; and (3) the ALJ failed to evaluate the medical evidence in separate time periods. The Court has meticulously reviewed the entire record and for the reasons discussed below the Court rejects Plaintiff's arguments and **AFFIRMS** the Commissioner's decision.

## I. STANDARD OF REVIEW

A disability under the Social Security Act is defined as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . .

42 U.S.C. § 423(d)(1)(A). A claimant will be found disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy. . . .

42 U.S.C. § 423(d)(2)(A). To make a disability determination in accordance with these provisions, the Commissioner has established a five-step sequential evaluation process.[1]

The standard of review applied by this Court to the Commissioner's disability determinations is set forth in 42 U.S.C. § 405(g). According to § 405(g), "the finding of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is that amount and type of evidence that a reasonable mind will accept as adequate to support the ultimate conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Williams*,

---

1. Step one requires the claimant to establish that he is not engaged in substantial gainful activity as defined at 20 C.F.R. §§ 404.1510 and 404.1572. Step two requires the claimant to demonstrate that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1521. If claimant is engaged in substantial gainful activity (step one) or if claimant's impairment is not medically severe (step two), disability benefits are denied. At step three, claimant's impairment is compared with those impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). *See* 20 C.F.R. § 404.1525. If a claimant's impairment is equal or medically equivalent to an impairment in the Listings, claimant is presumed disabled. If a Listing is not met, the evaluation proceeds to step four, where the claimant must establish that his impairment or combination of impairments prevents him from performing his past relevant work. A claimant is not disabled if he can perform his past work. If a claimant is unable to perform his past work, the Commissioner has the burden of proof at step five to establish that the claimant, in light of his age, education, and work history, has the residual functional capacity ("RFC") to perform an alternative work activity in the national economy. If a claimant has the RFC to perform an alternate work activity, disability benefits are denied. *See,* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140–142, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); and *Williams v. Bowen*, 844 F.2d 748, 750–53 (10th Cir.1988).

844 F.2d at 750. In terms of traditional burdens of proof, substantial evidence is more than a scintilla, but less than a preponderance. *Perales*, 402 U.S. at 401, 91 S.Ct. 1420. Evidence is not substantial if it is overwhelmed by other evidence in the record. *Williams*, 844 F.2d at 750.

To determine whether the Commissioner's decision is supported by substantial evidence, the Court will not undertake a *de novo* review of the evidence. *Sisco v. U.S. Dept. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir.1993). The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner. *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.1994). The Court will, however, meticulously examine the entire record to determine if the Commissioner's determination is rational. *Williams*, 844 F.2d at 750; *Holloway v. Heckler*, 607 F.Supp. 71, 72 (D.Kan.1985).

In addition to determining whether the Commissioner's decision is supported by substantial evidence, it is also this Court's duty to determine whether the Commissioner applied the correct legal standards. *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir.1994). The Commissioner's decision will be reversed when he/she uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards. *Glass*, 43 F.3d at 1395.

## I. INTRODUCTION

In July 1987 Plaintiff worked for a few weeks at Sherwood Manor, a nursing home. On July 10, 1987, Plaintiff was lifting a patient from his bed to a wheelchair, when she alleges that she felt something in her back pop. It is Plaintiff's primary contention that the pain from this July 10th injury prevents her from performing any substantial gainful activity.

The medical record is in relative agreement that there is no objective, medically verifiable, or physiological basis for Plaintiff's pain. The objective tests all show a normal cervical and lumbar spine with no disc narrowing or disease. There is, however, a significant disagreement in the medical record regarding the degree to which Plaintiff's pain is somatic [2] in origin, and, if it is, the degree to which Plaintiff's somatic pain disorder reduces her residual functional capacity.

After a review of the entire record, which will be discussed below, the Court finds that the ALJ was faced with conflicting evidence regarding Plaintiff's mental impairments. This conflicting evidence required the ALJ to strike a balance and choose, based on the record as a whole, which competing inferences he would draw from the record. The Court's review of the ALJ's choice in such a situation is, as it should be, very limited. The Court will not re-weigh the evidence or substitute its judgment for that of the ALJ. *Glass*, 43 F.3d at 1395. The Court will overrule the ALJ's choice of competing inferences only when the ALJ's choice finds no support in the record. Based on an analysis of the ALJ's opinion (*r.* at 377–382), the Court finds that the ALJ's conclusions find support in the record and are, therefore, supported by substantial evidence. *See, e.g., Thompson v. Apfel*, No. 99–7065, 2000 WL 136862 (10th Cir. Feb.7, 2000); and *Casey v. Chater*, No. 95–5224, 1997 WL 346163 (10th Cir. June 24, 1997).

## II. PROCEDURAL AND MEDICAL SUMMARY

Plaintiff was injured at Sherwood Manor on July 10, 1987. On that day, she went to the Oklahoma Osteopathic Hospital and was seen by Walter F. Kempe, D.O. Plain-

---

**2.** "A somatoform disorder exists when there are '[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.' " *Tolbert v. Chater*, No. 96–5120, 1997 WL 57091, at * 1, n. 2 (10th Cir. Feb.11, 1997) (a copy of which can be found in the record at page 453). "The disorder causes a claimant to exaggerate her physical problems in her mind beyond what the medical data indicate." *Id.* (citing *Easter v. Bowen*, 867 F.2d 1128, 1130 (8th Cir. 1989)). "Such a disorder may itself be disabling." *Id.*

tiff complained of pain in her low back. Dr. Kempe diagnosed lumbar strain and prescribed conservative treatment measures to include bed rest, moist heat, muscle relaxers and pain medication. By September 1987, Plaintiff was reporting that her back was "much better" with a "little tenderness." *R.* at 239–45. Plaintiff did not see Dr. Kempe again after September 1987. Plaintiff did not seek treatment again for more than two years.

Plaintiff filed a workmen's compensation claim in connection with her on-the-job injury at Sherwood Manor. In connection with this claim, Plaintiff was examined by Michael D. Farrar, D.O., at the request of her lawyer, and she was examined by Sami R. Framjee, M.D., at the request of Sherwood Manor's lawyers. Plaintiff saw Dr. Framjee in October 1988 and July 1989. Plaintiff saw Dr. Farrar in May of 1989.

Dr. Framjee, examining Plaintiff for the defense in her workmen's compensation case, took x-rays which showed a normal cervical and lumbar spine. Dr. Framjee found no tenderness and no reflex muscle spasms. Dr. Framjee noted that Plaintiff laughed throughout the examination, but gave multiple unnecessary moans and groans on examination. It was Dr. Framjee's impression that Plaintiff exhibited a marked, slow gait with effort when being observed, but that she exhibited a normal gait when not being observed. Dr. Framjee found no evidence of any occupational injury, and that work would be therapeutic for Plaintiff. *R.* at 289–96.

Dr. Farrar, examining Plaintiff for the prosecution in her workmen's compensation case, found that Plaintiff was suffering from cervical and lumbar strain. Dr. Farrar found stiffness, muscle inflamation,[3] muscle spasm, and a decreased range of motion in Plaintiff's cervical and lumbar spines. Dr. Farrar ultimately concluded, for workmen's compensation purposes, that Plaintiff was experiencing 14% permanent partial disability due to problems with her cervical spine, and 11% permanent partial disability due to problems with her lumbar spine. *R.* at 246–52.

Plaintiff filed her application for social security disability benefits on October 3, 1989. In November and December 1989, two non-examining physicians (Dr. Beck and Dr. Woodcock respectively) reviewed Plaintiff's medical records and issued physical RFC assessments. These assessments are consistent with the ALJ's conclusion that Plaintiff can perform the full range of sedentary work. *R.* at 221–228 and 232–33.

After the filing of her application with the Social Security Administration, Plaintiff sought sporadic treatment. Plaintiff saw Dr. Farrar in November 1989, January 1990 and October 1990, and then did not see him again. At each visit, Plaintiff complained of persistent pain in her back. Dr. Farrar diagnosed chronic cervical and lumbar strain, and found muscle spasm, stiffness, inflamation, and decreased range of motion. *R.* at 299. Plaintiff also saw a Richard A. Felmlee, D.O., on January 30, 1990 and February 6, 1990. Dr. Felmlee found that Plaintiff's x-rays were normal. Dr. Felmlee found that Plaintiff was suffering from "[l]umbosacral strain with accompanying somatic dysfunctions." *R.* at 260. Dr. Felmlee prescribed conservative treatment such as hot packs, ultrasound treatments and pain medication. *R.* at 254–260.

In February 1990, Plaintiff was referred by the Social Security Administration to Galen Baldwin, M.D., for a consultative examination in connection with her disability claim. Dr. Galen's report is sparse on analysis, but he found that Plaintiff could stand and walk without difficulty, but had some difficulty bending and lifting. *R.* at 283–84. In June 1990 Plaintiff was also referred to Shashi Husain, M.D., for an EMG. Dr. Husain found that Plaintiff was not suffering from any nerve damage (i.e.,

---

**3.** Diagnosed by Dr. Farrar as "myofasciitis." See *Taber's Cyclopedic Medical Dictionary* p. 1264 (17th ed.1993).

there was "no evidence of any acute radiculopathy or neuropathy"). *R.* at 271. In June 1990 Plaintiff was also referred to J.D. McGovern, M.D., for a second consultative examination. Upon examination, Dr. McGovern found no objective medical support for any of Plaintiff's subjective complaints. Dr. McGovern noted excessive moaning and groaning by Plaintiff, and found her to be generally uncooperative. Dr. McGovern also observed that despite her subjective complaints, Plaintiff was able to go down the stairs without difficulty. *R.* at 274–78.

Based on the medical record described above, and Plaintiff's testimony at a May 1990 hearing (*r.* at 84–155), the ALJ denied benefits on September 17, 1990. The ALJ determined that Plaintiff had the RFC for a limited range of sedentary work. The ALJ then denied benefits at step five of the sequential evaluation process by applying grid rule 201.24. *R.* at 72–78. In June of 1991, the Appeals Council vacated the ALJ's September 1990 decision and remanded the case. The Appeals Council found that the ALJ had not performed a correct credibility analysis regarding Plaintiff's subjective pain complaints. The Appeals Council also found that Plaintiff had certain nonexertional impairments (i.e., stooping, bending, crouching, crawling, etc.), and that the ALJ should have obtained testimony from a vocational expert regarding these nonexertional limitations. *R.* at 40–41.

Upon remand from the Appeals Council, the ALJ held a second hearing in December 1991 and received additional testimony from Plaintiff and a vocational expert. *R.* at 107–127. In February 1992, the ALJ issued his second decision, again denying benefits. This time, the ALJ denied benefits at step four of the sequential evaluation process. The ALJ determined that Plaintiff had the RFC to perform medium work, and that Plaintiff could return to her past relevant work as a dish room and tray line supervisor at Hillcrest Medical Center. *R.* at 308–14. During this remand period, Plaintiff saw Dr. Felmlee, and his associates, on nine separate occasions from

January 1992 to March 1992. The conclusions reached by the doctors at each of these examinations are all similar. They noted cervical and lumbar strain, muscle spasm, muscle inflamation, and decreased range of motion. As the examinations progressed, the doctors began to note "somatic dysfunction" as their impression. *R.* at 324–33. In October 1992, the Appeals Council again vacated the ALJ's February 1992 decision, and remanded the case to another ALJ. The Appeals Council found that the ALJ's decision did not provide sufficient analysis to support his conclusion that Plaintiff retained the RFC to perform medium work. Consequently, the Appeals Council also determined that the ALJ had not adequately presented Plaintiff's limitations to the vocational expert. *R.* at 316–17.

Upon remand from the Appeals Council, a new ALJ held a third hearing in December 1992 at which he received additional testimony from Plaintiff and the vocational expert. *R.* at 128–155. In January 1993, the ALJ ordered two consultive examinations of Plaintiff. A psychological examination was performed by John W. Hickman, Ph.D., on January 22, 1993 and a physical examination was performed by Michael Karathanos, M.D., on January 26, 1993. Dr. Hickman's "diagnostic impression" was that Plaintiff was suffering from "somatoform pain disorder." *R.* at 344. Dr. Hickman observed that Plaintiff's speech was hesitant and "rather dramatic, with her making sure everyone knew she was in great pain with many 'sighs and oh's', and holding her head with her hands." *Id.* at 345. Despite these histrionics, Dr. Hickman observed that Plaintiff's "body posture was relaxed rather than tense, with no abnormal movements." *Id.* Using the WAIS–R test, Dr. Hickman found Plaintiff had a full scale IQ of 66, and using Shipley, that Plaintiff had an estimated IQ of 81. Dr. Hickman believed these scores were indicative of mild mental retardation. Dr. Hickman administered the MMPI, and found that people with scores similar to Plaintiff's usually evi-

dence significant depression, although Dr. Hickman did not diagnose depression. Dr. Hickman found that Plaintiff had limitations in her ability to do all work-related activities except her ability to understand and carry out simple job instructions, and her ability to maintain her personal appearance.[4] *R.* at 344–51.

When Dr. Karathanos examined Plaintiff, he noted that Plaintiff had an "obvious embellishment of her complaints," and that she "walked in a very deliberate and slow way," and that she was "always moaning and groaning." *R.* at 352. Dr. Karathanos found that it was impossible for him to determine Plaintiff's true limitations because of Plaintiff's "embellishment of symptoms." Dr. Karathanos' impression was that Plaintiff had lumbosacral strain with significant somatic features. *R.* at 352–56.

The ALJ issued a third decision in May 1993 again denying benefits. The ALJ determined that Plaintiff retained the RFC to perform a limited range of sedentary work. The ALJ denied benefits at step five of the sequential evaluation process, finding that there were a significant number of jobs in the national economy that Plaintiff could perform given her RFC (e.g., teacher's aide, telephone sales, dispatcher, bench assembly, cashier, and information clerk). *R.* at 17–29. In September 1994, the Appeals Council adopted the ALJ's decision. *R.* at 7–8. Plaintiff appealed the Commissioner's final decision to this Court, and this Court affirmed the Commissioner's decision in March 1996. *R.* at 441–451. Plaintiff appealed this Court's decision to the Tenth Circuit, and in February 1997 the court of appeals reversed, with directions that this case be remanded to the Commissioner. *R.* at 453–61.

During the federal court appeal process, Plaintiff saw a doctor one time for her back pain. She saw Paul Higbee, M.D., in November 1995. While discussing Plaintiff's social history with her, Dr. Higbee

asked about the injury that resulted in her pain and Dr. Higbee found her response to be "a little frankly suspicious." *R.* at 481. Dr. Higbee noted that Plaintiff's gait upon examination was "kind of contorted looking." *Id.* Dr. Higbee diagnosed chronic lumbar strain and recommended that Plaintiff "resume working of some type." *Id.* at 482. Dr. Higbee further advised Plaintiff that he would not prescribe narcotic therapy for her back pain. *Id.*

The Tenth Circuit reversed the Commissioner's decision primarily because the ALJ, in the third May 1993 decision, did not address the evidence in the record, especially that from Dr. Hickman, which indicated that Plaintiff might be suffering from a somatic dysfunction. Specifically, the Tenth Circuit held that "[t]he ALJ's findings made no reference to Dr. Hickman's diagnosis of somatoform pain disorder, and did not consider whether [Plaintiff's] exaggerated complaints were a manifestation of this disorder, affecting her perception of pain." *R.* at 457. The Tenth Circuit concluded "that the ALJ erred in rejecting Dr. Hickman's diagnosis of somatoform pain disorder without providing any explanation for doing so, and that this error infected his evaluation of [Plaintiff's] subjective complaints of pain and, therefore, his evaluation of her credibility." *Id.* at 459.

Upon remand from the Tenth Circuit, Plaintiff was referred back to Dr. Hickman, a psychologist, in February 1997 for a follow up consultative examination. Plaintiff was also referred to Thomas A. Goodman, M.D., a psychiatrist, in October 1997 for a consultative examination. Dr. Hickman's "diagnostic impression" after his second examination of Plaintiff was significantly different than his earlier diagnosis of "somatoform pain disorder." Upon examination the second time, Dr. Hickman's "diagnostic impression" was that Plaintiff suffered from a "depressive disorder in partial remission with somati-

---

**4.** Dr. Hickman's use of "fair" and "poor" on his assessment form is evidence of disability.

*See Cruse v. DHHS,* 49 F.3d 614, 618 (10th Cir.1995).

zation features," and "features of a histrionic personality disorder." *R.* at 473. Using the WAIS-R test, Dr. Hickman found that Plaintiff had a full scale IQ of 79, which was 13 points higher than his previous finding. Dr. Hickman opined that the improvement in mental functioning could be secondary to Plaintiff taking an anti-depressant. Dr. Hickman also administered the MMPI-2 and found that individuals with MMPI-2 scores similar to that of Plaintiff often evidence significant levels of depression, lowered activity levels, apathy, and helplessness. Dr. Hickman found that Plaintiff had moderate to no significant limitations in her ability to do all work-related activities except her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, which he founded to be markedly limited because of Plaintiff's "somatic focus and preoccupation." *R.* at 471-77.

Dr. Goodman, the psychiatrist, completely disagreed with Dr. Hickman, the psychologist, whose report he had reviewed. Dr. Goodman finds that Plaintiff is suffering from "no psychiatric disorder." *R.* at 486. Plaintiff denied to Dr. Goodman that she had any difficulties with crying, sadness or depression. Plaintiff also denied any difficulties with her concentration. Plaintiff did report that she becomes anxious when under stress. After his examination, Dr. Goodman found that Plaintiff "presents no evidence of a current psychiatric disorder or impairment. Psychologically, I see no reason why she could not do the same level of work in which she has always done previously." *Id.* Consequently, Dr. Goodman found that Plaintiff had no significant limitations in her ability to do all work-related activities. *R.* at 485-492.

Between seeing Dr. Hickman in February 1997 and Dr. Goodman in October 1997, Plaintiff had gall stone surgery at Hillcrest Medical Center in March 1997. There is no mention in any of these medical records of Plaintiff's allegedly disabling back pain. There is no mention of Plaintiff moaning or groaning about her back pain. Plaintiff also reported that upon admission she was not taking any medications. *R.* at 498-577. None of the physicians report that Plaintiff was complaining of back pain, even though they were evaluating her for abdominal pain. The only indication in these records is that Plaintiff was "positive for previous back injury." *R.* at 528.

In May 1998, the ALJ held another hearing after the remand from the Tenth Circuit. The ALJ received testimony from the Plaintiff, a vocational expert, and Harold Goldman, M.D., a medical expert used by the ALJ to help him interpret the medical evidence. *R.* at 390-439. Dr. Goldman's testimony is far from clear. However, Dr. Goldman did express the following opinions regarding the medical record. Dr. Goldman opined that, based on the medical records before him, Plaintiff neither met or equaled a listing. Dr. Goldman opined that, based on the medical evidence, Plaintiff had no limitations on her physical RFC. Regarding Plaintiff's mental RFC, Dr. Goldman testified that he agreed more with Dr. Hickman's report than Dr. Goodman's report. *R.* at 429. Based on the record, Dr. Goldman testified that he agrees with Dr. Hickman that Plaintiff would have difficulty performing work in a sustained fashion due to her somatic dysfunction. *R.* at 430-31.

Based on all of the evidence summarized above, the ALJ issued a fourth decision in August 1998 denying benefits. *R.* at 374-88. The ALJ found that Plaintiff retained the RFC to perform sedentary work. Based on her age, education, work experience and RFC, the ALJ applied grid 201.21 and found Plaintiff to be not disabled. The Appeals Council adopted the ALJ's decision in June 1999. *R.* at 364-66. Plaintiff has appealed, and the ALJ's August 1998 and the Appeals Council's June 1999 decisions are now before the Court for review pursuant to 42 U.S.C. § 405(g).

### III. ANALYSIS OF THE ALJ'S AUGUST 1998 DECISION

■ Cases such as this, where somatic dysfunction is the dominant theme, are

problematic for ALJs. In somatoform cases, ALJ's are required to make incredibly delicate credibility assessments in order to choose between two equally possible scenarios: either the claimant is suffering from a legitimate mental impairment, or the claimant is suffering from physical symptoms which are consciously being exaggerated in an effort to acquire disability benefits. In this case, the ALJ considered the entire record and determined that this Plaintiff was consciously exaggerating her symptoms. Plaintiff, of course, objects to the ALJ's conclusion. Plaintiff cannot, however persuasively demonstrate, considering the disputed record summarized above, that there is not substantial evidence (i.e., more than a scintilla) to support the ALJ's ultimate conclusion. The Court must, therefore, without re-weighing the evidence itself, affirm the Commissioner's decision.

Plaintiff's first allegation of error is that the ALJ ignored Dr. Hickman's reports and instead relied on Dr. Goodman's report. *See* Doc. No. 7, pp. 2–3. The Court does not agree. In fact, the ALJ specifically addresses Dr. Hickman's reports, including the difference between the first and second report. The ALJ also discusses Dr. Hickman's reports in light of all of the other evidence in the record. *R.* at 379–81. The ALJ also does not rely exclusively on Dr. Goodman's report as suggested by Plaintiff. In fact, the ALJ concludes that the balance is somewhere between Dr. Hickman's reports and Dr. Goodman's report. *R.* at 381. Having struck this balance, the ALJ concluded that Plaintiff's mental impairments were not severe enough to significantly limit her ability to perform work-related functions. *Id.* Plaintiff has offered no specific argument as to why the balance struck by the ALJ is improper, or why the reasons the ALJ gave for the balance he struck are not supported by the record.

Plaintiff's second allegation of error is that the ALJ failed to consider the effect of Plaintiff's depression on her IQ. *See* Doc. No. 7, pp. 3–4. The Court does not agree. The ALJ specifically found that Plaintiff "may be subject to a degree of depression." *R.* at 380. The ALJ then accepted the statement in Dr. Hickman's second report that the increase in Plaintiff's IQ scores could have been caused by the fact that she was now taking a mild antidepressant. *Id.* The ALJ then concluded that the more recent IQ results were "a more accurate assessment of [Plaintiff's] ability when following prescribed treatment." *R.* at 380–81. Plaintiff has offered no reason why it is improper for an ALJ to consider only those limitations which remain after prescribed treatment has been followed. *See, e.g., Pacheco v. Sullivan,* 931 F.2d 695, 698 (10th Cir.1991); and 20 C.F.R. § 404.1530.

Plaintiff's third allegation of error is that the ALJ failed to perform a proper analysis at step three of the sequential evaluation process. *See* Doc. No. 7, p. 4. Plaintiff argues that absolutely no analysis was made of listing 12.05C regarding mental retardation and listing 12.07 regarding somatoform disorders. The Court disagrees. On the second page of his opinion, the ALJ discussed step three's requirements and found that Plaintiff did not have an impairment that met or equaled any listing. *R.* at 375. The ALJ stated that the remaining discussion in his decision would lay a foundation for his step three conclusion. Plaintiff has offered no authority which suggests that the ALJ's step three analysis must all occur in the same paragraph of his opinion. Thus, as long as the ALJ's analysis as a whole supports his step three conclusion, his decision must be affirmed.

To meet listing 12.05C, Plaintiff's IQ scores must be between 60 and 70. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, listing 12.05C. For the reasons discussed above, the ALJ properly chose to rely on Dr. Hickman's second IQ results, which showed Plaintiff has a verbal IQ of 78, a performance IQ of 81, and a full scale IQ of 79. Plaintiff has failed, therefore, to demonstrate that she meets listing 12.05C.

As discussed above, the ALJ concluded that Plaintiff is not suffering from a legitimate somatoform disorder. Thus, the

ALJ could not have erred in concluding that Plaintiff does not meet listing 12.07 which is the listing for somatoform disorders. In any event, Part B of listing 12.07 requires that three out of the four criteria be present in order for the listing to be met. The ALJ specifically discusses the Part B criteria of listing 12.07 in his decision, and finds none of the criteria to be met. *R.* at 381. This finding is consistent with the ALJ's resolution of the conflict between Dr. Hickman's and Dr. Goodman's reports.[5] There is, therefore, no merit to Plaintiff's argument that the ALJ failed to analyze the applicable listings.

Plaintiff's fourth allegation of error is that the ALJ failed to consider whether Plaintiff was disabled for a closed period between 1993 and 1997. *See* Doc. No. 7, pp. 4–5. Plaintiff argues that Dr. Hickman's first report in 1993 establishes that she met listing 12.05C, and Dr. Hickman's report in 1997 shows that she improved to the point where she no longer met the listing. Plaintiff argues, therefore, that the ALJ should have awarded benefits from 1993 until the point at which this improvement occurred. The Court finds no merit in Plaintiff's argument. The ALJ adequately discussed the differences between Dr. Hickman's 1993 [6] and 1997 test results, and determined that the 1993 test results were not a reliable assessment of Plaintiff's IQ due to several factors which are outlined in the ALJ's opinion. *R.* at 379–81.

Plaintiff's fifth allegation of error is that the ALJ "ignored the diagnosis of somatoform disorder in assessing [Plaintiff's] credibility." *See* Doc. No. 7, p. 5. Relying on the Tenth Circuit's previous order, Plaintiff makes something in the nature of a *res judicata* or law of the case argument. Plaintiff seems to argue that the Tenth Circuit held that Plaintiff was suffering from a somatoform disorder, and ordered the ALJ on remand to assess Plaintiff's credibility in light of this disorder. However, the Tenth Circuit did not specifically find that Plaintiff was suffering from a somatoform disorder. Rather, the court of appeals simply remanded because the ALJ had not even discussed Dr. Hickman's 1993 somatoform diagnosis. The court of appeals did not require the ALJ to accept or reject Dr. Hickman's 1993 diagnosis on remand. The court of appeals simply required the ALJ to specifically address the diagnosis, and either accept it or give specific, legitimate reasons for rejecting it. In his most current decision, the ALJ spends many paragraphs discussing Dr. Hickman's 1993 diagnosis and giving reasons for his rejection of the diagnosis.[7] The Court finds, therefore, that the ALJ has complied with the Tenth Circuit's earlier mandate.

## CONCLUSION

For the reasons discussed above, the Court finds that the ALJ's decision to deny benefits in this case is supported by substantial evidence. Consequently, the Court **AFFIRMS** the Commissioner's decision to deny benefits in this case.

IT IS SO ORDERED.

---

5. Even Dr. Hickman's second report is consistent with the ALJ's listing conclusion. Dr. Hickman's most current report would at most compel a finding that only one out of the four Part B criteria in listing 12.07 is met (i.e., repeated episodes of deterioration or decompensation in work or work-like settings). *See R.* at 474–77; and Testimony of Dr. Goldman at the May 1998 hearing, *R.* at 429.

6. Dr. Hickman's first report also contained widely varying IQ scores. The WAIS scores ranged from 66–68, which would meet Part A of listing 12.05C, but the Shipley score of 81 would not meet the listing.

7. Plaintiff also argues that the ALJ mischaracterized Plaintiff's mental impairment as mere "features" of somatization. Even if this were true, there is no indication in the ALJ's opinion that he gave dispositive weight to this "characterization" of Plaintiff's impairment. In reality, the ALJ was simply stating what Dr. Hickman himself stated in his most recent report: "depressive disorder in partial remission with somatization features." *R.* at 473.